IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NATHAN ALLEN RAILEY, | ) | |
|    Petitioner, | ) | |
| | ) | CIVIL ACTION NO. 13-00493-CG |
| v. | ) | |
| | )CRIMINAL ACTION NO. 10-00266-CG-N |
| UNITED STATES OF AMERICA, | ) | |
|    Respondent. | ) | |

## REPORT AND RECOMMENDATION

Nathan Allen Railey, a federal prisoner, has filed, through counsel, a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. 219[1]) and supporting memorandum (Doc. 220) challenging his conviction in the above-styled criminal action.[2] Under S.D. Ala. GenLR 72(b), this matter has been referred to the undersigned Magistrate Judge, who under S.D. Ala. GenLR 72(a)(2)(R) is authorized to require responses, issue orders to show cause and any other orders necessary to develop a complete record, and to prepare a report and recommendation to the District Judge as to appropriate disposition of Railey's § 2255 motion, in accordance with 28 U.S.C. § 636(b)(1)(B)-(C), Rule 8(b) of the Rules Governing § 2255 Proceedings for the United States District Courts, and S.D. Ala. GenLR 72(a)(2)(R).

Upon consideration, and for the reasons stated herein, the undersigned **RECOMMENDS** that Railey's § 2255 motion (Doc. 219) be **DENIED** and that

---

[1] All docket citations (Doc. __) herein refer to the docket of the above-styled criminal action.

[2] Railey later filed duplicates of his § 2255 motion and supporting memorandum that he had personally signed under penalty of perjury in accordance with 28 U.S.C. § 1746. (Docs. 223, 224).

Railey be **DENIED** both a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal.

## I.      Background

Railey was tried in the above-styled criminal action on a five-count Second Superseding Indictment issued by the Grand Jury on February 24, 2011, charging the following offenses:

- **Counts 1, 2, & 3** each charged an offense of production of child pornography by a parent, in violation of 18 U.S.C. § 2251(b).

- **Count 4** charged an attempt to violate § 2251(b), in violation of 18 U.S.C. § 2251(e).

- **Count 5** charged knowing possession of images of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) & (b)(2).

 (*See* Doc. 88).   Railey retained H. Chase Dearman, Esq. to represent him in the district court through trial, sentencing, and entry of judgment.

On June 16, 2011, Railey filed a notice of intent to plead guilty to Count 1 of the Second Superseding Indictment.  (*See* Doc. 122).  The plea was to be pursuant to a written plea agreement advising that Railey would face a "mandatory minimum of fifteen (15) years and a maximum of thirty (30) years imprisonment" on his conviction for Count 1 but that the "United States w[ould] recommend to the Court that the defendant be sentenced within the advisory sentencing guideline range as determined by the Court." (Doc. 227-1 at 4, 7).[3]  The plea agreement also preserved

---

[3] After the guilty plea hearing was set, Dearman filed an unsigned copy of the plea agreement with the Court (Doc. 125), which was ordered stricken from the record after

Railey's right to appeal the Court's denial of his motion to suppress. (*See* Doc. 227-1 at 8).

A change of plea hearing was set for June 20, 2011. (*See* Doc. 123). On Dearman's request at the June 20 hearing for "additional time," the change of plea hearing was continued to June 22, 2011. (*See* Doc. 124). However, Railey decided not to plead guilty at the June 22 hearing, and the case proceeded to jury trial, commencing July 14, 2011. (*See* Docs. 128, 196).

Trial testimony established that Railey met Lemenda Tanner over the internet, and the two began dating in April 2009. Tanner had two daughters from a previous relationship, identified as "C" and "K" at trial. At the time Railey and Tanner began dating, C was eight years old and K was twelve. Railey moved in with the Tanners in November 2009. Tanner worked at a travel agency on weekdays from 8:00 a.m. to 5:00 p.m. Railey, who was proficient in computers, spent most of his days at the home working with computer software for a business venture with his brother Curtis, using a laptop Curtis had purchased him for that purpose. Thus, he was often responsible for looking after C and K while they were at the home and Tanner was at work.

Railey and Tanner married on July 16, 2010. Around that time, Railey, with Tanner's knowledge, purchased a camera disguised as a pen, claiming he needed it to secretly record his ex-wife in connection with a custody dispute involving their son. On August 13, 2010, Tanner came home from work while Railey was asleep in

---

Railey chose not to plead guilty (*see* Doc. 128). The Government has attached a copy of the plea agreement to its response. (*See* Doc. 227-1).

the couple's bedroom and went to use C and K's bathroom.  While there, Tanner noticed that Railey's pen camera was poking out of a makeup bag sitting on top of the toilet, with the camera lens aimed toward the shower.  Tanner attempted to view the contents of the pen camera but found nothing on it.  Tanner then woke Railey and demanded to know why he was trying to film her daughters.  Tanner then ordered Railey to leave the home, which he did after packing his belongings.  Beginning the next day, and over several days, Railey sent a series of text messages to Tanner in which he admitted to inappropriately touching his younger stepdaughter "a few times" but claimed that C was "no angel" and often initiated it.  On August 15, 2010, K admitted that Railey had sexually molested her as well.

On August 18, 2010, Mobile city police executed a search warrant at Railey's brother's residence, where Railey had been staying after being kicked out of Tanner's home.  Officers seized Railey's pen camera and laptop computer.  Forensic examination of the laptop indicated that the operating system had been re-installed on August 17, 2010.  Nevertheless, a number of images of child pornography were recovered from the computer's "unallocated space."   While examining officers recognized many of these images from other investigations as being widely available on the internet, thirty-six of the images did not appear to have come from the internet and appeared "homemade."  Metadata associated with these "homemade" images indicated they were taken with a Kodak camera.  Tanner testified that the family owned a Kodak Easyshare digital camera that all of them, including Railey, had used.  Government witnesses testified that, based on the contents of the laptop

computer, including a number of personal documents such as emails, resumes, and legal documents, Railey was the sole user of the laptop computer.  K and C both testified at trial that Railey sexually abused them on multiple occasions after moving in with the Tanners in November 2009.

The "homemade" images are focused on the genitals of a prepubescent girl, with a hand shown pulling the girl's panties aside to expose her pubic area.  Tanner identified the girl in the image as C, based on the depicted girl's hot pink-painted fingernails and a blue blanket that is also visible in the images.  Chris Iber, an image examiner with the FBI and one of the Government's expert witnesses, testified that the hand depicted in the "homemade" images matched Railey's based on distinctive scarring and hair patterns.  Iber also linked the images to the Tanner family's Kodak camera through both metadata embedded in the images matching the camera's unique serial number and by utilizing a special proprietary software that measured the camera's unique properties in converting light into images. Government computer expert Gus Dimitrelos confirmed Iber's testimony regarding the camera's serial number embedded in the "homemade" images.  Railey's own computer expert, Wade Morgan, testified that he also found child pornography in the unallocated space of Railey's laptop but that he could not conclusively determine whether the "homemade" images had come from the family Kodak camera because he had been told by the manufacturer that that particular model of camera did not embed unique data in photographs, nor could Morgan retrieve serial numbers from the images.  Railey did not testify at trial.

On July 19, 2011, the jury returned a verdict of guilty on all five counts of the Second Superseding Indictment.  (*See* Doc. 154).  On October 26, 2011, Railey was sentenced to "THREE HUNDRED SIXTY (360) MONTHS as to each of Counts 1 & 2, said terms to be served concurrently with each other; ONE HUNDRED EIGHTY (180) MONTHS as to each of Counts 3 & 4, said terms to run concurrently with each other, but consecutively to the terms imposed as to Counts 1 & 2; and SIXTY (60) MONTHS as to Count 5, said term to be served consecutively to the terms imposed as to Counts 1, 2, 3 & 4[;]" written judgment was entered October 31, 2011.  (Doc. 174).

Dearman filed a notice of appeal on Railey's behalf and simultaneously moved to withdraw as counsel and for appointment of appellate counsel.  (*See* Doc. 177).  The Court granted Dearman leave to withdraw and appointed Arthur Madden III, Esq. to represent Railey on direct appeal.  (*See* Doc. 181).  Madden raised two issues on Railey's direct appeal: (1) whether this Court erred when it refused to grant Railey's request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether a City of Mobile police detective knowingly or recklessly submitted false statements in her affidavit in support of a state search warrant that resulted in the collection of evidence later used against him at trial; and (2) whether this Court erred when it determined that, even though the warrant was unsupported by probable cause, the evidence gathered pursuant to the search warrant was admissible against him at trial because of the police's reasonable, good-faith reliance on the search warrant.  (Doc. 214).  On July 12, 2012, the Court

of Appeals for the Eleventh Circuit issued judgment affirming Railey's conviction. *See* (Docs. 214, 215); *United States v. Railey*, 481 F. App'x 545 (11th Cir. 2012) (per curiam) (unpublished).  Railey did not seek *en banc* rehearing with the Eleventh Circuit, nor did he petition the United States Supreme Court for certiorari review.

Railey, represented by present counsel William M. Kent, Esq., timely filed his § 2255 motion on October 10, 2013.[4]  After conducting preliminary review of the § 2255 motion under Rule 4(b) of the Rules Governing Section 2255 Proceedings, the undersigned set deadlines for answers and replies under Rule 5 of the Rules Governing Section 2255 Proceedings (*see* Doc. 221), with extensions of the deadlines granted to both parties.  The Government timely filed its response in opposition (Doc. 227) to the § 2255 motion, and Railey timely filed a reply (Doc. 232) to the response.

After considering the briefing of the parties under Rule 8(a) of the Rules Governing Section 2255 Proceedings, the undersigned determined that certain claims warranted an evidentiary hearing, which was held before the undersigned on September 17, 2015.  Present were Railey, his counsel Kent, and Assistant United

---

[4] "[F]or federal criminal defendants who do not file a petition for certiorari with t[he Supreme] Court on direct review, § 2255's one-year limitation period starts to run when the time for seeking such review expires."  *Clay v. United States*, 537 U.S. 522, 532 (2003). "According to rules of the Supreme Court, a petition for certiorari must be filed within 90 days of the appellate court's entry of judgment on the appeal or, if a motion for rehearing is timely filed, within 90 days of the appellate court's denial of that motion."  *Close v. United States*, 336 F.3d 1283, 1285 (11th Cir. 2003) ("Here, we entered judgment on the appeal on 1 August 1997, and the appellants had until 90 days later, or 30 October 1997, to file a petition for certiorari. Close and Estes had one year from that date, until 30 October 1998, to file a motion for postconviction relief under § 2255. They did not file by that date, and the district court was correct to dismiss their motions filed several days later as untimely.").

States Attorney Adam Overstreet, counsel for the Government.  Both Railey and
Dearman were sworn and gave testimony at the hearing.

## II.   Applicable Law

Railey's § 2255 motion raises seven claims for relief (hereinafter, "Claim I,"
"Claim II," etc.), each alleging some form of ineffective assistance of counsel in
violation of the Sixth Amendment to the U.S. Constitution.

### A.   General Standards Under § 2255

Title 28 U.S.C. § 2255 "permits a federal prisoner to bring a collateral
challenge by moving the sentencing court to vacate, set aside, or correct the
sentence." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215-16 (11th Cir.
2014).  Section 2255 provides:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the
> sentence was imposed in violation of the Constitution or laws of the
> United States, or that the court was without jurisdiction to impose
> such sentence, or that the sentence was in excess of the maximum
> authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or
> correct the sentence ... If the court finds that the judgment was
> rendered without jurisdiction, or that the sentence imposed was not
> authorized by law or otherwise open to collateral attack, or that there
> has been such a denial or infringement of the constitutional rights of
> the prisoner as to render the judgment vulnerable to collateral attack,
> the court shall vacate and set the judgment aside and shall discharge
> the prisoner or resentence him or grant a new trial or correct the
> sentence as may appear appropriate.

28 U.S.C. § 2255(a)-(b).

"Once the defendant's chance to appeal has been waived or exhausted," a
court is "entitled to presume he stands fairly and finally convicted, especially when,

as here, he already has had a fair opportunity to present his federal claims to a federal forum." *United States v. Frady*, 456 U.S. 152, 164 (1982). "[A] collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (per curiam) (citing *Frady*, 456 U.S. at 165 (collecting cases)). "Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, and (2) relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Id.* at 1232 (internal citations, quotations, and footnote omitted).

> Once a petitioner files a § 2255 motion, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." [28 U.S.C.] § 2255(b). A petitioner is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." *Aron*[ *v. United States*], 291 F.3d [708,] 715[ (11th Cir. 2002)] (quoting *Holmes v. United States,* 876 F.2d 1545, 1552 (11th Cir. 1989)). "[A] petitioner need only *allege*—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." *Id.* at 715 n.6. However, a district court need not hold a hearing if the allegations are "patently frivolous," "based upon unsupported generalizations," or "affirmatively contradicted by the record." *Holmes,* 876 F.2d at 1553 (quoting *United States v. Guerra,* 588 F.2d 519, 520– 21 (5th Cir. 1979)); *see, e.g., Lynn v. United States,* 365 F.3d 1225, 1239 (11th Cir. 2004) ("Because the ... affidavits submitted by Lynn amount to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied Lynn's § 2255 motion.").

*Winthrop-Redin*, 767 F.3d at 1216 (footnote omitted).   *Accord, e.g.*, *Diveroli v. United States*, 803 F.3d 1258, 1263 (11th Cir. 2015).

### B.   Ineffective Assistance of Counsel

The Sixth Amendment gives criminal defendants the right to effective assistance of counsel. U.S. Const., amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984).   "To establish an ineffective assistance of counsel claim, a defendant must show that (1) 'counsel's representation fell below an objective standard of reasonableness' and (2) that such failure prejudiced him in that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "   *United States v. Pease*, 240 F.3d 938, 941 (11th Cir. 2001) (per curiam) (quoting *Strickland*, 466 U.S. at 687-88, 694).   " 'Conclusory allegations of ineffective assistance are insufficient.' "   *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) (per curiam) (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991)).   Moreover, "[b]ecause both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."   *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).   *See also Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) ("A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the defendant has made an insufficient showing on one.");   *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("The petitioner bears the burden of

proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland*

claim, and both prongs must be proved to prevail.  The *Strickland* test is not easily

met; as we have said, 'the cases in which habeas petitioners can properly prevail on

the ground of ineffective assistance of counsel are few and far between.[]' " (quoting

*Waters v. Thomas,* 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (citation omitted))).

"The test for ineffectiveness is not whether counsel could have done more;

perfection is not required." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995)

(en banc).  "A lawyer can almost always do something more in every case. But the

Constitution requires a good deal less than maximum performance."  *Atkins v.*

*Singletary*, 965 F.2d 952, 960 (11th Cir. 1992).

> In evaluating the first, or "performance," prong of *Strickland,*
> "[j]udicial scrutiny of counsel's performance must be highly
> deferential." [*Strickland*, 466 U.S.] at 689, 104 S. Ct. at 2065. Because
> retrospective evaluation of a lawyer's performance can be difficult, "a
> court must indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that ... the challenged
> action might be considered sound trial strategy." *Id.* (internal
> quotations omitted). A petitioner must identify specific acts or
> omissions that were not the result of reasonable professional
> judgment, and a court should deem these acts or omissions deficient
> only if they "were outside the wide range of professionally competent
> assistance." *Id.* at 690, 104 S. Ct. at 2066. Simply put, the deference
> afforded an attorney's decision is great and the bar for proving a Sixth
> Amendment violation is high. In light of the "strong presumption in
> favor of competence," we have held that in order to prove deficient
> performance, "a petitioner must establish that no competent counsel
> would have taken the action that his counsel did take." *Chandler v.*
> *United States,* 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).
>
> Under the second, or "prejudice," prong of Strickland, a petitioner must
> "affirmatively prove prejudice" by showing that counsel's errors
> "actually had an adverse effect on the defense." 466 U.S. at 693, 104 S.
> Ct. at 2067. This requires a showing of more than "some conceivable

effect on the outcome of the proceeding." *Id*. Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694, 104 S. Ct. at 2068. Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693, 104 S. Ct. at 2068. When evaluating this probability, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id*. at 695, 104 S. Ct. at 2069.

*Brownlee v. Haley*, 306 F.3d 1043, 1059-60 (11th Cir. 2002).

"[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 509 (2003). Indeed, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Id*. at 504. *See also United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("An ineffective assistance claim should usually be raised in a motion under 28 U.S.C. § 2255." (citing *United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010))), *cert. denied*, 134 S. Ct. 962 (2014).

### III.  Analysis

#### A.  Deficient Plea Advice (Claims I, II, & III)

In Claim I, Railey contends that the "overwhelming" amount of admissible evidence against him at trial shows that his case "was absolutely unwinnable and that any reasonably competent criminal defense lawyer would have easily recognized that fact and communicated this to the client."  (Doc. 220 at 2, 4).

Dearman, however, allegedly "did not do so" and "[i]nstead,…counseled Railey that the case was 'triable.' " (*Id.* at 4).

> Specifically, Railey alleges:
>
> Despite Dearman's assurance that the case was "triable," Railey was interested in a possible plea agreement and upon Railey's instructions, Dearman asked the Government to prepare a proposed plea agreement. The Government did so, and after some review and revision, what was intended to be the final plea agreement was filed with the Court…
>
> …
>
> However, in a final, last minute discussion with his counsel before going on the record at the change of plea hearing, Railey asked Dearman three key and interrelated questions:
>
> > (1) He asked Dearman to assess the defensibility of his charges at trial before a jury; and
> >
> > (2) He asked []Dearman's advice whether he should accept the plea agreement or not; and
> >
> > (3) He asked Dearman what his maximum exposure was if he went to trial and were convicted.
>
> Dearman advised…that the case was "triable."
>
> Dearman did not recommend that Railey give up his right to trial and plead guilty, instead he gave what appeared to Railey to be neutral advice, only that he should "consider" the plea agreement.
>
> Finally, as to sentencing consequences, Dearman told Railey that his maximum sentence upon conviction would be 30 years, with a 15 year minimum mandatory.

(*Id.* at 5-6).   Railey alleges that, had Dearman advised him that "the case was indefensible and that he faced not 30 but 130 years imprisonment if convicted at trial[,]" he "would not have gone to trial and instead would have gone forward with

the plea agreement and received a sentence substantially less than that which he received after trial." (*Id.* at 8).

Claims II and III offer specific examples of Claim I's general assertion that Dearman failed to recognize Railey's case was "indefensible" at trial. Claim II asserts that Dearman failed to recognize the strength of the Government's expert digital forensic evidence and explain it to Railey. Per Railey, "[h]ad Dearman done what he should have done he would have discovered that the Government would be able to indisputably prove that Railey's camera had made the home made child pornography images, and by proving that, the Government had proved counts one, two and three, subjecting Railey to up to 90 years imprisonment." (*Id.* at 12). Claim III asserts that Dearman similarly failed to properly advise Railey regarding the effect of "Railey's text messages to his wife…in which he appeared to confess that he had sexually molested his step-daughters…" (*Id.* at 14). Per Railey, "this text messaging evidence amounted to a confession of the Rule 414 child molestation testimony. Once the child molestation testimony was corroborated by Railey's own statements, the outcome of the trial was a foregone conclusion." (*Id.* at 15). Because Dearman allegedly failed to appreciate the significance of this evidence and explain it to Railey, Railey claims he was misled regarding his chances of success at trial, thus causing him to forego a guilty plea and proceed to trial.

Determining that Railey had alleged reasonably specific, non-conclusory facts in Claims I – III that, if true, would entitle him to relief, the undersigned held an evidentiary hearing on these claims.[5]  There, Railey testified to the following:

- Railey discussed many times with Dearman whether his case was triable and that Dearman would always tell him he had a "good case" or a "good defense" and that his case was "triable."

- Regarding the Government's expert evidence linking the "homemade" images to Railey's camera, Dearman told Railey that he had spoken with someone at Kodak, the camera's manufacturer, who told him that images could not be linked to a specific camera.  Dearman presented this information from Kodak as a viable defense and Railey thought it would be a good objection.

- Dearman told Railey he "might" be able to exclude the text messages between Railey and his ex-wife in which Railey admitted to molesting his stepdaughters.  Dearman said they would "probably" get "kicked out," though he never gave an absolute yes or no answer.  Dearman told Railey the text

---

[5] In opposing Railey's § 2255 motion, the Government cited cases indicating that "continual assertions of innocence demonstrate lack of prejudice in this context."  (Doc. 227 at 18-19 (citing cases)).  *See also, e.g., Aguasvivas-Castillo v. United States*, No. CIV. 12-1750CCC, 2014 WL 4953245, at *7 (D.P.R. Sept. 30, 2014); *Welch v. United States*, 370 F. App'x 739, 743 (7th Cir. Apr. 19, 2010) (per curiam) (unpublished) ("Based on his conversations with Welch, Chiphe reasonably understood that his client had no interest in entering a guilty plea. Although in hindsight Welch may now regret his choice, he received exactly the assistance he wanted at the time-an attorney who would aggressively fight the bank-robbery charge at trial.").  However, for purposes of determining whether an evidentiary hearing was warranted, the undersigned was not convinced by those portions of the record to which the Government cited for the proposition that Railey "vigorously maintained his innocence throughout trial, sentencing and appeal."  (Doc. 227 at 19).  Railey did not testify at trial, his only statement at sentencing was that he would "like to appeal[,]"(Doc. 200 at 11), and he did not claim innocence, or even insufficiency of the evidence, on direct appeal, instead challenging only the Court's rulings on suppression issues.

messages were "bad for the case" but continued to discuss the case in a positive manner.

- Railey participated in preparing the factual resume that accompanied his plea agreement.

- Railey admitted that the change-of-plea hearing was "an important decision-making day" and that it was "rough" for him.  While on the one hand claiming that he came to the hearing intending to accept the plea agreement, he also testified that that he "wasn't excited" about doing so and that he was "more wanting to try to defend [his] case if possible."

- At the change-of-plea hearing, Railey asked Dearman how much time he was looking at if he went to trial, and Dearman told him several times "you're going to get life."  Railey asked Dearman to specify how much time if he failed at trial, and Dearman said 30 years.  Railey asked Dearman to clarify several times what he meant by "life" because the charges did not specify life as a possible sentence, only "15 to 30" years.  Railey also asked if the sentences would be run concurrent.  Railey understood Dearman's saying Railey could get "life" as meaning "30 years" and that "30 years" was the maximum sentence Railey was facing if he went to trial.

- Railey then asked Dearman how much time he would get if he took the plea, and Dearman responded 17 to twenty-something years.  Since this did not seem to be a significant difference in time, Railey figured he should take his chances at trial.  Railey then asked Dearman if he had a good case, and

Dearman told him "yes, you do."  Since facing 22 years entering a plea versus facing 30 years going to trial did not seem a significant difference to Railey, he felt it was "logical" to take his chances at trial if he "had a good case."

- Railey claims he knew that he would have to register as a sex offender if he pled guilty and denies this was a "sticking point" for him.  He admits he told Dearman it would follow him the rest of his life but knew there was nothing he could do about that.

- When Railey asked Dearman if he should take the plea agreement, Dearman told him several times it was a decision Railey had to make.  Railey claims he would have accepted the plea agreement had he "been given correct advice." Had he known he faced a 130 year sentence, this would have changed his reasoning "significantly."

-  Railey admits he saw a large portion of the evidence in this case, as well as motions, which he reviewed, analyzed, and provided thoughts to Dearman about.  Railey worked directly with his expert witness, Wade Morgan, before being sent to jail.  After Railey was detained, he would communicate with Morgan through written notes, using Dearman as a go-between.   Railey believed Morgan would be a good expert, though he was aware that there were some issues as to whether Morgan was "using older software."

- Railey knew that there were images of child pornography, including the "homemade" pictures of his stepdaughter, on his laptop that the Government had seized.  He also knew that his stepdaughters would testify against him at

trial.   Dearman told Railey he would try to keep them out, and Railey thought there was a strong possibility Dearman could.   Railey also knew that the text messages to his wife admitting to molesting his stepdaughters might be introduced at trial.

Following Railey's testimony, the Government called Dearman as a witness, who testified to the following:

- Dearman was initially retained to represent Railey on state charges of rape and sodomy, which were dismissed after Railey's federal indictment was handed down.   Railey's brother Curtis paid Dearman for his representation.   However, Curtis stopped paying Dearman after Railey rejected his plea agreement.   Despite this, Dearman agreed to continue representing Railey through trial.

- Dearman couldn't recall if he'd ever done a trial in federal court prior to Railey's, though it was his first case involving child pornography and computers.

- Dearman last spoke to Railey shortly after his sentencing.   Throughout the case, Railey continuously maintained that he wasn't guilty and that he didn't do anything wrong.   In spite of admonitions from both Dearman and Curtis that he should tell Dearman the truth, Railey was adamant and persistent in insisting he was not guilty of any of the charges, always "clearly" and unequivocally" maintaining "I did not do this."   Dearman testified that one

reason he fought so hard in this case was that he believed Railey "100%." Curtis and Wade Morgan also believed Railey's claims of innocence.

- Dearman described Railey as "one of the brightest guys" he's met and as a person that knew a lot more about computers than Dearman did.

- Dearman doesn't believe he's ever had a client that participated in his defense as much as Railey did, putting his involvement at a 10 on a scale of 1 to 10.  Railey corresponded frequently with Dearman and gave plausible explanations for everything in the reports of both Morgan and Government expert Gus Dimitrelos.  Railey also read the suppression motion Dearman drafted, demanded copies of all the cases cited therein, and wrote notes and questions to Dearman on the motion.

- Dearman provided "everything he knew" to Railey, including the Government's expert reports about linking Railey's camera to the "homemade" images – there "wasn't anything" that Dearman held back from Railey.

- Railey and his expert witness, Morgan, "spoke each other's language" on technical issues and would often develop plans or ideas together before informing Dearman.  Dearman never had an issue with Morgan and never heard Railey speak an "ill word" or express misgivings about Morgan.

- In Dearman's opinion, Railey's case "initially" seemed "defensible."  There were lots of questions about data preservation and collection, and the issue of linking Railey's camera to the "homemade" images didn't come into play until

the second superseding indictment.  Dearman felt the reports of Morgan and Dimitrelos "battled out to a draw," and the "homemade" images were "so blurry" an observer "barely could tell it's a human being."

- Railey knew that his text messages were available to the Government and might be admitted.  Dearman told Railey he would file a motion in limine to exclude them.  Though he believed the Court would prefer to have a witness testify instead of having documentary evidence presented, Dearman did not know how the Court would rule and never told Railey the text messages would not be admitted.

-  Dearman "clearly, unequivocally" told Railey that his stepdaughters would testify against him at trial.  However, Railey wrote "volumes" explaining, to both Dearman and Curtis (with whom Railey had authorized Dearman to discuss the case), why the children were not telling the truth and how their mother was pressuring them to testify falsely.  Railey also told Dearman he believed the children wouldn't testify and was "so adamant" that at least one of the girls would recant on the stand.  Dearman discussed the stepdaughters' testimony with Railey a lot.  Dearman found Railey's explanations as to the stepdaughters "credible," found they "made sense to some degree," and believed that he had evidence calling at least one girl's testimony into question.  However, Dearman told Railey that "under no circumstances" should he believe that either of the stepdaughters would recant on the stand.

- Dearman believes that one factor in Railey's rejection of his plea agreement was that his ex-wife was in the courtroom at the guilty plea hearing, and Railey was adamant that he "was not going to get up there and say I'm guilty and I touched those girls."  Railey had wanted the molestation allegations removed from the factual resume supporting his plea agreement, but the Government had refused this demand.

- Railey had also expressed reservations about having to register as a sex offender, saying that his life would be over, that he would no longer be able to work with computers, that he "wanted absolutely clearly unequivocally no part of that," and that he would "have no life like that."

- Dearman though the plea agreement was a "great deal" and "clearly, unequivocally" recommended to Railey that he accept it.

- Railey never asked Dearman to negotiate any plea agreement, or to inquire whether the Government would consider another after the first was rejected. Dearman himself approached the Government to negotiate the rejected plea agreement after receiving the Government's expert report linking Railey's camera to the "homemade" images, then presented the plea agreement to Railey.

- Dearman does not remember telling Railey that his sentencing exposure if he went to trial was capped at 30 years.  He also does not recall equating "30 years" with a "life" sentence, though he "probably mentioned at some time" that Railey was facing a possibility of life in prison if he went to trial.  As he

does with all of his clients, Dearman explained to Railey that a judge can sentence you to whatever and a judge doesn't have to accept "what's there," "can disregard the guidelines," and "can go above" or "down."

• Dearman did not put any of his advice to Railey in writing, though he would relay discussions between him and Railey to Curtis via email.

> The Supreme Court has long recognized that *Strickland*'s two-part inquiry applies to ineffective assistance of counsel arising out of the plea process. *See Hill v. Lockhart,* 474 U.S. 52, 57, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)…[I]n *Missouri v. Frye,* —— U.S. ——, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012), and *Lafler v. Cooper,* —— U.S. ——, 132 S. Ct. 1376, 182 L.Ed.2d 398 (2012), the Court clarified that the Sixth Amendment right to the effective assistance of counsel extends specifically "to the negotiation and consideration of plea offers that lapse or are rejected." *In re Perez,* 682 F.3d 930, 932 (11th Cir. 2012) (per curiam). The Court concluded that, in order to establish prejudice, a defendant must show a reasonable probability that but for counsel's ineffectiveness: (1) "the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)"; (2) "the court would have accepted its terms"; and (3) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler,* 132 S. Ct. at 1385; *see Frye,* 132 S. Ct. at 1409.

*Osley*, 751 F.3d at 1222. *See also Gissendaner v. Seaboldt*, 735 F.3d 1311, 1317 (11th Cir. 2013) ("Where, as here, a petitioner rejects a plea offer, she must establish that there is a reasonable probability that she would have accepted that offer but for counsel's deficient performance, and that the plea would have resulted in a lesser charge or a lower sentence. *See Frye*, 132 S. Ct. at 1409; *Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (applying *Hill* to a rejected plea offer and concluding that, under those circumstances, prejudice requires a showing that 'there is a reasonable probability that, but for counsel's errors, [the petitioner]

would have pleaded guilty and would not have insisted on going to trial') (quotation marks, ellipsis, and brackets omitted)."), *cert. denied*, 135 S. Ct. 159 (2014).").

In deciding ineffective assistance claims, courts "are to avoid the 'distorting effects of hindsight' and judge the reasonableness of counsel's action from the reference point of the time of counsel's conduct." *Blankenship v. Hall*, 542 F.3d 1253, 1273 (11th Cir. 2008) (citing *Strickland*, 466 U.S. at 689-90).  For Claims I, II, and III, the relevant reference point is Railey's June 22, 2011 change-of-plea hearing, at which Dearman purportedly gave Railey deficient advice causing him to forego the plea agreement and proceed to trial.  Dearman's actual trial performance is not dispositive of these three claims.

### 1.    Dearman's Assessment of Case's "Triability"

To show deficient performance, Railey "must demonstrate that [Dearman] made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment."  *Osley*, 751 F.3d at 1222 (citing *Strickland*, 466 U.S. at 687). "[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 689).  Having considered the testimony of both Railey and Dearman given at the evidentiary hearing, the undersigned finds that, given the circumstances, the record does not support a determination that Dearman performed deficiently in advising Railey at the change-of-plea hearing that his case was "good" and "triable," rather than "indefensible" and "hopeless."

"The Supreme Court has recognized that the decision to plead guilty may occur without all of the [prosecution]'s evidence and necessarily takes place without knowledge of all facts revealed by witnesses at trial." *Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir. 1991) (en banc) (citing *McMann v. Richardson*, 397 U.S. 759, 769-70 (1970)).  "An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each." *Id.  See also Scott v. Wainwright*, 698 F.2d 427, 429 (11th Cir. 1983) ("Counsel must be familiar with the facts and the law in order to advise the defendant of the options available…Counsel's advice need not be errorless, and need not involve every conceivable defense, no matter how peripheral to the normal focus of counsel's inquiry, but it must be within the realm of competence demanded of attorneys representing criminal defendants.").  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Johnson v. Upton*, 615 F.3d 1318, 1330 (11th Cir. 2010) (quotations omitted).

Dearman's testimony at the evidentiary hearing credibly indicates that he had performed some investigation of the evidence and, based on this investigation, identified certain issues to focus on at trial.  Per Dearman, there were questions about data preservation and collection.  He also felt the reports of defense expert Wade Morgan's and Government expert Gus Dimitrelos "battled out to a draw" and

believed there were issues with identifying the "homemade" images, which were "so blurry" an observer "barely could tell it's a human being."  Railey focuses largely on the ultimate outcome of his trial in support of his contention that Dearman failed to sufficiently appreciate the strength of the Government case against him.  However, the mere fact that Railey was convicted at trial does not show that Dearman was deficient in his pretrial evaluation of the case.  *See Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("[T]he fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel." (citing *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc));  *Mostowicz v. United States*, No. 13-12265, 2015 WL 5125608, at *4 (11th Cir. Sept. 2, 2015) (per curiam) (unpublished) ("Although Mr. Mostowicz takes issue with the ultimate outcome of his case, this is not *proof* of deficiency under *Strickland*.").  "[W]ithout evidence that [Dearman] gave incorrect advice or evidence that he failed to give material advice, [Railey] cannot establish that his performance was deficient" in advising him at his change-of-plea hearing.  *Burt*, 134 S. Ct. at 17 (quotation omitted) (alterations added).

The evidentiary hearing testimony also makes it apparent that Railey himself bears a significant share of the blame for Dearman's perhaps overly optimistic assessment of Railey's chances at trial, due to his failure to be honest with his attorney.  *See Johnson v. Upton*, 615 F.3d 1318, 1331 (11th Cir. 2010) ("In *Strickland*, the Supreme Court explained that '[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions' because '[c]ounsel's actions are usually based, quite properly

on ... information supplied by the defendant.' 466 U.S. at 691, 104 S. Ct. at 2066. Thus, 'inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.' *Id.*"). Though Railey now readily admits his guilt, Dearman credibly testified that, despite being admonished by both Dearman and his brother Curtis to tell Dearman the complete truth, Railey always "clearly and unequivocally" maintained "I'm not guilty" and "I did not do this." According to Dearman, "not one time did [Railey] ever admit to doing anything that was charged in th[e] indictment."

Dearman also credibly testified that Railey was heavily involved in preparing his case, that he provided Railey every piece of discovery he received, and that "there was not one thing brought up by the Government that [Railey] didn't have some kind of plausible explanation for." For instance, Railey wrote Dearman "volumes" explaining that his stepdaughters were lying about being molested and were being pressured by their mother to testify against Railey.[6] Confronted with a client who continuously maintained his total innocence and provided plausible explanations for the Government's evidence against him, and having himself identified issues with the Government's evidence in his own investigations, Dearman's assessment of the case as "triable" with some "good" issues to bring out was not unreasonable at the time of Railey's change-of-plea hearing.

Even if Dearman deficiently assessed Railey's chances at trial when advising him whether to accept the plea agreement, the record evidence does not support a

---

[6] Despite this, Dearman made clear to Railey that he should expect his stepdaughters to testify at trial and that "under no circumstances" should he expect either of them to recant on the stand.

finding that he was prejudiced by it – that is, Railey has not shown a reasonable probability that, but for Dearman's overly optimistic advice, he would have accepted the Government's plea agreement and would not have insisted on going to trial. "A defendant's 'after the fact testimony concerning his desire to plead, without more, is insufficient to establish' prejudice." *Pericles v. United States*, 567 F. App'x 776, 782 (11th Cir.) (per curiam) (unpublished) (quoting *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991)), *cert. denied*, 135 S. Ct. 690 (2014). Though Railey asserts in his § 2255 motion that he "was interested in a possible plea agreement" and that "Dearman asked the Government to prepare a proposed plea agreement" "upon Railey's instructions," credible testimony given at the evidentiary hearing does not support these assertions.

In addition to testifying that Railey always denied any guilt even to his own attorney, *see supra*, Dearman also credibly testified that Railey never asked him to approach the Government about a possible plea agreement. Dearman himself approached the Government to negotiate the plea agreement after receiving the Government's expert report linking the "homemade" images found on Railey's laptop to Railey's camera, which Dearman testified he felt was the only "direct scientific link" to Railey, then presented the offered plea agreement to Railey. This testimony strongly suggests that Railey was not in fact interested in pleading guilty and wanted to go to trial. *See Rosin v. United States*, 786 F.3d 873, 878-79 (11th Cir. 2015) (defendant's persistent refusal to accept responsibility and adamant

professions of his innocence belied assertions that he would have pled guilty but for counsel's advice), *cert. denied*, No. 15-402, 2015 WL 5735399 (U.S. Nov. 2, 2015).

That Dearman sought the plea agreement, unbidden by his client, after receiving the expert report also belies Railey's Claim II that Dearman failed to appreciate the strength of the Government's "smoking gun" expert digital forensic evidence linking the "homemade" pornography with Railey's camera.  As for Claim III, asserting that Dearman did not appreciate and explain the effect of Railey's text messages to his wife admitting to inappropriate behavior with his stepdaughters, Railey admitted at the evidentiary hearing Dearman told him the text messages to his ex-wife were "bad for the case."  He also admitted that, while Dearman told him he would try to get the text messages excluded at trial and even that they would "probably" be excluded, Dearman never told him they were certain to be excluded. Dearman confirmed that he never told Railey the text messages would be excluded.

Even assuming Railey might have been interested in pursuing a plea agreement generally, additional evidence supports the determination that Railey was not interested in accepting the Government's offered plea agreement <u>as</u> <u>written</u>.  Dearman credibly testified that Railey had wanted removed from the plea agreement's factual resume language admitting that he had molested his stepdaughters; however, the Government would not agree to this concession, and Railey was adamant that he "was not going to get up there and say I'm guilty and I touched those girls," particularly with his ex-wife present in the courtroom. Dearman also credibly testified that Railey "wanted absolutely clearly

unequivocally no part of" having to register as a sex offender because his life would be over and he would no longer be able to work with computers.[7] *Cf. Cook v. United States*, 613 F. App'x 860, 865-66 (11th Cir. June 3, 2015) ("Although Cook was interested in pleading guilty, and although he testified at the hearing that he was willing to accept whatever plea deal was offered by the government in order to avoid trial, '[g]iven [Cook's] awareness of the [nascent] plea offer, his after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer.' *Diaz,* 930 F.2d at 835.  The record is clear that Cook, both at the time of plea negotiations and at the § 2255 evidentiary hearing, refused to accept more than limited responsibility and maintained that the confessions were forged. In short, Cook wanted a plea deal that the government simply was not willing to offer … Given the parties' entrenched and widely divergent positions on a potential plea deal, Cook has not shown a reasonable probability that a plea deal could have been reached and then accepted by the court.").   Overall, the undersigned finds the credible evidence of record preponderates against a determination that Railey actually wanted to accept the Government's plea agreement.

Moreover, the undersigned finds that, regardless of Dearman's alleged failure to appreciate it, Railey himself was sufficiently aware of the strength of the Government's evidence against him when he made the decision not to plead guilty.

---

[7] While Railey conclusorily testified at the evidentiary hearing that he was interested in accepting the plea agreement when he went into the change-of-plea hearing, he also admitted that he "wasn't excited" about pleading guilty and was "more wanting to try to defend [his] case if possible."

As Dearman credibly testified, Railey was shown all or most of the Government's evidence against him and was heavily involved in the preparation of his case.[8]  For example, Railey reviewed transcripts of the text messages to his ex-wife, and even returned hand-written notes to Dearman giving "exculpatory" explanations for some of them.  (*See* Gov't's Evid. Hearing Ex. 2).  Dearman also credibly testified that Railey communicated frequently with his expert witness, Wade Morgan, that the two of them "spoke each other's language" on technical issues (due to their mutual backgrounds in working with computers), and that they would often develop plans or ideas together before informing Dearman.  Dearman never had an issue with Morgan and never heard Railey speak an "ill word" or express misgivings about Morgan.  Given that Railey could have appreciated the strength of the Government's evidence against him even without Dearman explaining it to him, Railey has not shown *Strickland* prejudice in this regard.

For these reasons, Railey's claims of ineffective assistance of counsel in Claims I, III, and III based on Dearman's alleged failure to appreciate and convey the strength of the Government's case must fail.

---

[8] Indeed, common sense indicates that Railey should have been aware of the Government's most damaging evidence against him – the presence of illegal pornography on his own laptop computer, including the "homemade" images; his stepdaughters' testimony of molestation by Railey; his text messages admitting to inappropriate behavior with his stepdaughters – regardless of whether Dearman specifically produced it to him.  *Cf. Pericles*, 567 F. App'x at 781 ("Pericles does not even allege that he did not know his own criminal history. Had Pericles wished for his attorney to evaluate what effect his convictions might have on any sentence he would receive, he could have simply told his attorney about his personal criminal history. He did not need for his attorney to go searching for information that he himself possessed.").

## 2.      Yes or No – Should I Take the Plea?

Railey claims that one reason he rejected the plea agreement was because Dearman allegedly refused to answer "yes" or "no" when asked if Railey should accept the agreement.   In his § 2255 motion, Railey alleges that, in response to Railey's inquiry, Dearman "gave what appeared to Railey to be neutral advice, only that he should 'consider' the plea agreement…"   At the evidentiary hearing, however, Railey simply testified that Dearman told him several times it was a decision Railey had to make.

The undersigned rejects this claim of error.   First, as set forth above, the credible evidence of record preponderates against a determination that Railey actually wanted to accept the Government's plea agreement.   Moreover, Dearman credibly testified that he "clearly, unequivocally" recommended that Railey accept the plea offer.   Finally, Dearman was correct in advising Railey that the ultimate decision to plead was his to make.   "The decision whether to plead guilty … belong[s] to" the defendant.   *Stano*, 921 F.2d at 1152.   This is reflected in Federal Rule of Criminal Procedure 11, which requires a court to "determine that a plea is voluntary and did not result from force, threats, or promises" before it is accepted. Fed. R. Crim. P. 11(b)(2).   *See also Stano*, 921 F.2d at 1140 ("[I]t is not the attorney, but the defendant who enters a guilty plea and who is questioned by the court to determine whether the plea is made voluntarily, knowingly and intelligently."). The Court of Appeals for the Second Circuit has explained the balancing act criminal defense attorneys must engage in during plea bargaining:

On the one hand, defense counsel " 'must give the client the benefit of counsel's professional advice on this crucial decision' " of whether to plead guilty. *Boria v. Keane,* 99 F.3d 492, 497 (2d Cir. 1996) (quoting Anthony G. Amsterdam, *Trial Manual 5 for the Defense of Criminal Cases* (1988)) (emphasis omitted); *see also Cullen v. United States,* 194 F.3d 401, 404 (2d Cir. 1999) ("*Boria* recognizes a lawyer's general duty to advise a defendant concerning acceptance of a plea bargain."); Model Rules of Professional Conduct Rule 1.4(b) (1995) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."). As part of this advice, counsel must communicate to the defendant the terms of the plea offer, *see Cullen,* 194 F.3d at 404, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed, *see United States v. Gordon,* 156 F.3d 376, 380 (2d Cir. 1998) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.") (internal quotation marks omitted); *Jones v. Murray,* 947 F.2d 1106, 1110-11 (4th Cir. 1991) (interpreting Standards for Criminal Justice 14-3.2(b) (2d ed. 1986 Supp.)).

On the other hand, the ultimate decision whether to plead guilty must be made by the defendant. *See* Model Rules of Professional Conduct Rule 1.2(a) (1995) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered...."). And a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer. *See Jones,* 947 F.2d at 1111 ("[V]arious [ABA] Standards place[ ] upon counsel an affirmative duty to avoid exerting 'undue influence on the accused's decision' and to 'ensure that the decision ... is ultimately made by the defendant.' " (quoting Standards for Criminal Justice 4-5.1(b) & 14-3.2(b))).

Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because "[r]epresentation is an art," *Strickland,* 466 U.S. at 693, 104 S. Ct. 2052, and "[t]here are countless ways to provide effective assistance in any given case," *id.* at 689, 104 S. Ct. 2052. Counsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), whether the defendant has

maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision.

*Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000).

Thus, to the extent Railey asserts Dearman should have commanded or persuaded him to accept the plea agreement, Dearman was not ineffective.

### 3.      Life = 30 Years?

Railey next claims that Dearman advised him at the guilty plea hearing that he would only face a maximum possible sentence of thirty years if he went to trial. As set forth above, the credible evidence of record preponderates against a determination that Railey actually wanted to accept the Government's plea agreement.  Moreover, based on the testimony given at the evidentiary hearing, the undersigned does not find this particular claim credible.  Railey admits that, when he initially asked Dearman what possible sentence he faced if he went to trial, Dearman told him several times that "you're going to get life."  Railey claims, however, that he asked Dearman to clarify what he meant by "life," since none of the charges against Railey stated "life" as a possible sentence, at which time Dearman allegedly told him that "life" meant "thirty years."  For his part, Dearman believes he "probably mentioned at some time" that Railey was facing a possibility of life in prison if he went to trial but does not remember telling Railey that his sentencing exposure if he went to trial was capped at thirty years, or that he equated a sentence of thirty years as being a "life" sentence.

As Railey pointed out in his testimony at the evidentiary hearing, the record is clear that some confusion as to his maximum sentence arose during the

preparation of Railey's presentence investigation report (PSI), following his rejection of the plea agreement and his subsequent conviction at trial. The draft PSI stated that Railey's "guideline range of imprisonment is life. However, because counts one through four each carry a statutory maximum of 30 years, the guideline range is 360 months, pursuant to U.S.S.G. § 5G1.1(a)." (Doc. 162 at 17, ¶ 113). The Government filed no objection to the draft PSI (*see* Doc. 163); Dearman testified that he knew the 360-month guideline range given in the draft PSI was erroneously low but did not intend to bring it to the Court's attention, since the error was to Railey's benefit. Nevertheless, the final, revised PSI deleted the sentence setting the guideline range at 360 months and substituted the following in its place: "This [imprisonment for life] may be accomplished by imposing the statutory maximum of 30 years as to each of counts one through four, to run consecutively, and 120 months as to count five to run consecutively to the sentence imposed in counts one through four, or to the extent necessary to achieve a term of life imprisonment, pursuant to U.S.S.G. § 5G1.2(d)." (Doc. 167 at 18, ¶ 114). Dearman admitted that he did not notice this change in the final PSI until Railey's sentencing hearing was underway.

Whatever the impact of Dearman's failure to note the change in the PSI, it is not relevant to whether Dearman sufficiently advised Railey when he chose to reject the Government's plea agreement months earlier. The undersigned finds that Railey, whether unconsciously or deliberately, is attempting to "retroactively" apply this incident to Dearman's advice given at the change-of-plea hearing. The undersigned credits Dearman's testimony that he did not equate a life sentence

with thirty years or otherwise advise Railey that his sentence if he went to trial would be capped at thirty years.  Thus, the undersigned rejects Railey's claim that Dearman provided erroneous sentencing information in advising him whether to plead guilty.

**B.      Failure to Move for Dismissal and/or Acquittal (Claims IV, V, & VI)**

Claims IV, V, and VI each argue, for various reasons, that Dearman was ineffective for failing to move for dismissal of and/or acquittal on certain counts of the indictment.  As will be explained, Railey has failed to show that any of these arguments for dismissal and/or acquittal had a reasonable chance of succeeding if raised.    An attorney is not ineffective for failing to raise arguments that he reasonably determines to be without merit, *see, e.g.*, *Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995) ("[C]ounsel need not pursue constitutional claims which he reasonably believes to be of questionable merit."); *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("Counsel was not ineffective for failing to raise these issues because they clearly lack merit."), and even if Dearman could be faulted for failing to raise any of these arguments, Railey has not shown he was prejudiced by this failure because he has not shown a reasonable probability that any of them would have succeeded, either in this Court or on appeal.  Because Railey has failed to satisfy either *Strickland* prong for these claims, the undersigned **RECOMMENDS** that Claims IV, V, and VI be **DENIED** without an evidentiary hearing.

### 1.      Claim IV

In Claim IV, Railey argues that Dearman was ineffective for failing to file either a pretrial motion to dismiss or a motion for judgment of acquittal at trial as to Counts 1 - 4 of the Second Superseding Indictment.  Each of those counts charged a violation of, or an attempt to violate, 18 U.S.C. § 2251(b), which required the Government to prove that Railey "knowingly permit[ted a] minor to engage in, or to assist any other person to engage in, sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct[,]" or, in the case of Count 4, that he attempted to do so.[9]  The "visual depictions" supporting Counts 1 – 3 consisted of the "homemade" images depicting the exposed genitals of one of Railey's minor step-daughters, taken while she slept; the attempted "visual depictions" used to support Count 4 relate to the discovery of Railey's pen camera that was directed at a shower used by his step-daughters.  Though no incriminating video was recovered from the pen camera, Railey contends that any video that may have been captured depicting the minor children would have shown them only "as they undressed to bathe or as they finished bathing."  (Doc. 220 at 18).  Railey contends that the evidence was insufficient to support his convictions under Counts 1 – 4, arguing that there is, and was, sufficient authority to support an argument that the "visual depictions" or attempted "visual depictions" supporting these counts did not depict "sexually

---

[9] *See* 18 U.S.C. § 2251(e) (providing that an attempt to violate § 2251 carries the same penalties as an actual violation).

explicit conduct," and that Dearman was ineffective for failing to press this argument.[10]

As the Government points out, "sexually explicit conduct" is statutorily defined as, *inter alia*, "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v). The Government has argued that the images at issue fit within this statutory definition based on application of the non-exclusive six-factor test for "lasciviousness" first set forth in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) ("*Dost* factors"), and since "endorsed [by other circuits] as a helpful, though not comprehensive, means for determining whether images are 'lascivious.' " *United States v. Grzybowicz*, 747 F.3d 1296, 1306 n.8 (11th Cir. 2014) (citing *Shoemaker v. Taylor*, 730 F.3d 778, 785 (9th Cir. 2013) (collecting cases)).[11] The Eleventh Circuit has neither adopted nor rejected application of the *Dost* factors. *See id.* ("Deciding whether the *Dost* factors should be part of the law of our circuit is unnecessary in this case.").

In reply to the Respondent's arguments that the subject images can be considered lascivious under the *Dost* factors, Railey argues that *"Dost* is not a firm

---

[10] In ruling on a Rule 29 motion for judgment of acquittal arguing insufficiency of evidence, a court must " 'view the evidence in the light most favorable to the government,' making all reasonable inferences and credibility choices in the government's favor, and then 'determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.' " *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (quoting *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008)).

[11] Indeed, "the *Dost* factors are the model for this circuit's pattern jury instructions." *Grzybowicz*, 747 F.3d at 1306 n.8 (citing 11th Cir. Pattern Jury Instr. (Crim.) 82 (2010)). "However, this Circuit's pattern instructions, while a valuable resource, are not binding law." *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015) (citing *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007)).

foundation on which to build a prosecution" and cites to authority that has criticized reliance on those factors. (*See* Doc. 232 at 2-8 (citing *United States v. Steen*, 634 F.3d 822, 828-30 (5th Cir. 2011) (Higginbotham, J., concurring) ("While I agree with the panel opinion, I write separately to note my misgivings about excessive reliance on the judicially created *Dost* factors that continue to pull courts away from the statutory language of 18 U.S.C. § 2251."); *United States v. Batchu*, 724 F.3d 1, 9 (1st Cir.) ("We have been clear that the *Dost* factors are problematic."), *cert. denied*, 134 S. Ct. 663 (2013))).[12]

Railey, however, has offered no alternative to the *Dost* factors for resolving this issue. Moreover, in support of Claim IV in his initial memorandum, Railey cites (generally, without providing a relevant pinpoint citation, quotation, etc.) to *United States v. Steen*, 634 F.3d 822 (5th Cir. 2011) (per curiam) as "federal circuit authority that []voyeuristic images of merely nude children do not support a conviction under 18 U.S.C. § 2251[,]" and criticizes Dearman for not presenting this authority to the Court. (Doc. 220 at 18-19).[13] However, *Steen* clearly applied the

---

[12] Ironically, the criticisms of *Dost* Railey cites take the position that the *Dost* factors improperly <u>narrow</u> the scope of "lascivious," to the <u>benefit</u> of criminal defendants. *See Steen*, 634 F.3d at 828 & n.1 (Higginbotham, J., concurring) (noting that other circuits had "found the *Dost* factors were 'over-generous to the defendant' " and "that the factors would 'be used to inappropriately limit the scope of the statutory definition.' "); *id.* at 830 ("The sixth[ *Dost*] factor, which asks whether the visual depiction was intended to elicit a sexual response in the viewer, is especially troubling. Congress did not make production of child pornography turn on whether the maker or viewer of an image was sexually aroused, and this *Dost* factor encourages both judges and juries to improperly consider a non-statutory element." (footnote omitted)); *Batchu*, 724 F.3d at 9 ("[T]he[ *Dost*] factors are not the equivalent of, **nor do they establish the limits of**, the statutory term 'lascivious.' " (emphasis added) (some quotation marks omitted)).

[13] The other case cited by Railey for this proposition, *United States v. McKelvey*, 203 F3d. 66 (1st Cir. 2000), is plainly inapplicable to the issue. As the Government correctly points out

*Dost* factors to determine that the image at issue – a voyeuristic video of a nude minor at a tanning salon, in which the minor's "pubic region is only visible for about 1.5 seconds" and in which the minor is unaware she is being filmed and thus acting naturally – was not a "lascivious exhibition" as used in the statute. 634 F.3d at 826-28. The *Dost* factors clearly played a significant role in *Steen*'s analysis, and Railey cannot simply latch onto *Steen*'s bare holding while asking the Court to disregard how it was reached – a hook to hang one's hat on is only as strong as the screws that anchor it.[14]

---

(*see* Doc. 227 at 25), the First Circuit expressly avoided deciding whether the subject images were lascivious. *See McKelvey*, 203 F.3d at 69 ("McKelvey claims that Rule 11(f)'s requirement could not possibly be satisfied, because the photographs that formed the basis for the charge did not depict minors engaged in sexually explicit conduct, as the statute requires. He further argues that Rule 11(f) could not be satisfied because he did not fulfill the statutory requirement that a defendant must possess 'three or more' pornographic items in order to incur criminal liability. Because our decision rests on the latter argument, we assume without deciding that the images contained on the negative strip are lascivious."). *But see id.* at 69 & n.3 ("Although the district judge also considered a set of other photographs, the government eventually abandoned its reliance on them; first in a bail hearing in the district court, albeit with some ambiguity, and then forthrightly during oral argument before this court. The government now argues that the conviction can stand solely on the photographs described above…We have received the other photographs as part of the record on appeal. They show a number of young boys 'skinnydipping.' Having reviewed them, we think that they fall far short of the legal definition of child pornography, and are squarely within the protection of the First Amendment." (footnote omitted) (dicta)).

[14] *Steen* did set forth a more generalized statement preceding its *Dost* analysis:

> In assessing conduct under § 2251(a), we ask "two questions: Did the production involve the use of a minor engaging in sexually explicit conduct, and was the visual depiction a depiction of such conduct?" Steen clearly used C.B. for the purposes of producing a nude video, but the statute requires more—the film must depict sexually explicit conduct. Accordingly, this court has found, "a child could be used in the production of a photograph, but the image in the ultimate photograph could be one that did not capture the child engaging in sexually explicit conduct. If this were so, a defendant might be charged under a different statute—perhaps child molestation—but not child pornography."

Railey has cited no binding authority indicating that this argument may have succeeded had Dearman raised it, and recent Eleventh Circuit authority indicates that any attempt to do so would have stood little chance of success.  In *United States v. Grzybowicz*, 747 F.3d 1296 (11th Cir. 2014), the defendant "challenge[d] on sufficiency of the evidence grounds his convictions for producing and possessing child pornography" under 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B), which required the Government "to prove that: (1) he knowingly produced and possessed (2) images of a minor (3) depicting that minor engaging in 'sexually explicit conduct' (4) using a facility of interstate or foreign commerce." *Id.* at 1305.  Like Railey, Grzybowicz argued that incriminating images found on his cell phone – depicting "(1) a man's hand opening the vagina of a small child wearing a yellow dress; (2) the man's finger inserted into the child's vagina; (3) the man's hand pulling back a diaper to reveal the child's vagina; and (4) the child's diaper and exposed vagina" – did not portray "sexually explicit conduct." *Id.* at 1300, 1305.  As in Railey's case, in *Grzybowicz* "the only potentially applicable part of the statutory definition of ['sexually explicit conduct' wa]s the one dealing with 'lascivious exhibition of the genitals or pubic area.' "[15]  *Id.* at 1305 (quoting 18 U.S.C. § 2256(2)(A)(v)).

---

634 F.3d at 826 (footnotes omitted) (quoting *United States v. Grimes*, 244 F.3d 375, 380 & n.11 (5th Cir. 2001)).

[15] "As for the other possible definitions of 'sexually explicit conduct,' the [images at issue] do not depict bestiality, masturbation, or sadistic or masochistic abuse. *See* 18 U.S.C. § 2256(2)(A). Nor do they portray 'sexual intercourse' within the meaning of federal law, which defines it as 'genital-genital, oral-genital, anal-genital, or oral-anal' intercourse. *Id.* § 2256(2)(A)(i)." *Grzybowicz*, 747 F.3d 1296, 1306 n.7.

As the Government does here, the parties in *Grzybowicz* "ask[ed the court] to consider…the *Dost* factors[] to define lasciviousness…" *Id.* at 1306. The Eleventh Circuit, however, rejected this request, holding that the issue did "not require a multi-factor analysis." *Id.* Noting that it had "previously defined a 'lascivious exhibition' as one that potentially 'excit[es] sexual desires' or is 'salacious'[,]" *id.* at 1306 (quoting *United States v. Williams*, 444 F.3d 1286, 1299 (11th Cir. 2006), *rev'd on other grounds*, 553 U.S. 285 (2008)), the Eleventh Circuit held:

> The evidence at trial established that Grzybowicz reached under a little girl's dress, pulled aside her diaper, and took four pictures of her vagina. Her vagina was the focal point of all four pictures, and in two of them Grzybowicz spread and then digitally penetrated it. The photos are blatantly lascivious. Grzybowicz cannot and has not suggested any non-sexual purpose they might have served or how they might possibly be viewed as non-sexual. We need not complicate the matter with resort to a multifactor analysis to conclude that any reasonable jury viewing these pictures not only could have but also would have found, as the jury in this case did, that they were a "lascivious exhibition of the genitals or pubic area." Indeed, it would have been unreasonable and utterly contrary to the evidence presented to have found otherwise.

*Id.*

Per the Government's response, "[t]he homemade child pornography images found on Railey's laptop and admitted at trial depict the genitals of a young, prepubescent girl. The images also depict an adult male's hand pulling back the girl's panties so that the focus of the images is on the girl's pubic area."[16] (Doc. 227

_____

[16] The Government has cited to a section of the trial transcript setting forth a "conversation between the investigating agent and [minor victim's mother] during which the photos are described[.]" (Doc. 227 at 7 n.2 (citing Doc. 198 at 214-21)). This portion of the transcript indicates that the victim's underwear, genitals, and buttocks are visible in some of the subject pictures, as well as a man's hand. However, none of the transcribed testimony indicates that the man's hand is actually depicted pulling on the victim's underwear to

at 7.  *See also id.* at 24 ("[A]lthough [the minor victim] was clothed, her panties were pulled back so that area photographed was completely nude.")).   These "homemade" images are similar to those at issue in *Grzybowicz*, which the Eleventh Circuit found "blatantly lascivious."   Therefore, it is unlikely that Dearman would have succeeded in arguing that the images forming the bases of Counts 1 – 3 did not constitute a "lascivious exhibition."  *See also United States v. Mathis*, 767 F.3d 1264, 1280 (11th Cir. 2014) (per curiam) ("two pictures of male genitalia [the minor victim] sent to Mathis, at least one of which was an image of male genitalia in an aroused state[,]" found to sufficiently constitute "a visual depiction of sexually explicit conduct" (citing *Grzybowicz*, 747 F.3d at 1305-07)), *cert. denied*, 135 S. Ct. 1448 (2015); *United States v. Boyle*, 700 F.3d 1138, 1146 (8th Cir. 2012)  ("The still images on the videotape focused exclusively on the girl's genitals, and a jury reasonably could infer that they were 'designed to appeal to the sexual appetite ... by ... focusing on the pubic area of the subject in a way that is lewd or lurid.' " (quoting *United States v. Kemmerling*, 285 F.3d 644, 646 (8th Cir. 2002)); *United States v. Strausbaugh*, 534 F. App'x 175 (3d Cir. Aug. 9, 2013), *cert. denied*, 134 S. Ct. 488 (2013) (unpublished) (photographs of an "eight-month-old child, naked from the waist down, being held by [the defendants] spreading the child's legs and genitals" was ""lascivious exhibition of the genitals or pubic area").

---

expose her genitals.  Railey's Final Presentence Investigation Report does note that Railey's older stepdaughter, who was not the stepdaughter pictured in the subject images, did assert that, when Railey molested her, he "did not remove her panties, but instead pulled them to the side." (Doc. 167 at 5, ¶ 8).

Count 4 charged an attempt to violate § 2251(b). "To establish an attempt as a crime, proof is required: (1) that the defendant intended to commit the underlying criminal offense with the requisite *mens rea,* and (2) that the defendant engaged in conduct which constituted a substantial step toward the commission of that crime and which strongly corroborates the defendant's criminal intent." *United States v. Rothenberg*, 610 F.3d 621, 626 (11th Cir. 2010). Both of Railey's stepdaughters testified that he had repeatedly molested them, and Railey had confessed to inappropriate activity to his wife in text messages introduced at trial. Moreover, the jury was presented evidence that Railey had produced other "lascivious" images of his younger stepdaughter's genitals (i.e. the images at issue in Counts 1 – 3). As such, a jury could have reasonably concluded that, based on Railey's sexual interest in the girls and his other photographic exploits, his actions in aiming the pen camera at the stepdaughters' shower while hiding it in a makeup bag were an attempt to capture more images depicting "lascivious exhibitions" when they undressed. *Cf. Boyle*, 700 F.3d at 1145 (finding sufficient evidence of an attempt to violate § 2251(a) where jury could have concluded that the defendant's repeated adjustments of camera were attempts to focus on minor's genitals to get more sexually suggestive images); *United States v. Nance*, 767 F.3d 1037, 1044 (10th Cir. 2014) (" 'While the underlying offense in this case requires the receipt of images of real-life minors engaged in sexually explicit conduct, the government in an "attempt" case has no burden to prove that the appellant knew that the downloaded file actually contained such images. Rather, the government is required to prove

that the appellant *believed* that the received file contained such images.' " (quoting *United States v. Pires*, 642 F.3d 1, 8 (1st Cir. 2011)).

Railey has shown no merit to his argument that the images at issue in Counts 1 – 4 were not "lascivious."   Thus, the undersigned **RECOMMENDS** that Claim IV be **DENIED** without an evidentiary hearing.

### 2.      *Claim V*

Under 18 U.S.C. § 2251(b), the Government is required to prove the offender "knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed."   Counts 1 – 4 of the Second Superseding Indictment, each charging an offense under § 2251(b), alleged only that the subject visual depictions were "produced using materials that had been mailed, shipped and transported in interstate and foreign commerce."  (Doc. 88 at 1-3).

In Claim V, Railey argues that Dearman was ineffective for failing to move for dismissal and/or acquittal on Counts 1 – 4 because the Government failed to prove this "interstate commerce" element.   According to Railey, "[t]he activity involved all took place in Railey's own home, and the actual images produced never

left Railey's laptop computer which was kept in his home (and then moved to his new residence when his wife kicked him out).  The charged images were not in fact transmitted or transported in interstate commerce, nor was there any intent or plan that they be transmitted or transported in interstate commerce, therefore neither of the alternative bases for this element was satisfied."  (Doc. 220 at 20-21 (footnote omitted)).  This claim appears premised on Railey's belief that "the interstate commerce element set forth in § 2251(a) requires either knowledge or reason to know that the child pornography ('CP') will be transmitted or transported interstate combined with proof that the CP was produced or transmitted using interstate materials or means, or that the CP in fact actually be transported or transmitted interstate.  Proof that [child pornography] was produced or transmitted using material or mans [sic] that had themselves traveled interstate is not a stand alone alternative method of proving the interstate commerce element."  (Doc. 232 at 12).

Railey suggests that, under the "rules of English grammar," "the plain meaning" of the "interstate commerce" provision of § 2251(b) is that the phrase "if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed" is a primary clause to which the phrases "if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer" and "if such visual depiction has actually been transported or transmitted using any means or

facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed" are subclauses – that is, to satisfy the "interstate commerce" element, the Government must prove the primary clause and one of the subclauses.

Railey's reading of § 2251(b) is mistaken.  In analyzing the interstate nexus requirement of § 2251(a), which mirrors that of § 2251(b), *supra*, the Eleventh Circuit has stated: "The most natural reading of this provision is that jurisdiction extends to child pornography (1) produced with the intent that it eventually travel in interstate commerce; (2) produced with materials that have traveled in interstate commerce; or (3) that has traveled in interstate commerce. Only the first basis for jurisdiction requires any proof of mental state."  *United States v. Smith*, 459 F.3d 1276, 1289 (11th Cir. 2006).  Railey dismisses this language from *Smith* as "mere dicta[,]" claiming that "[t]he issue in *Smith* was not what the constituent elements were, but whether the court was required to interpret a *scienter* element into the statute.  The appellant in *Smith* did not challenge what the sub-elements were." (Doc. 232 at 13 n.4).

The undersigned finds unpersuasive Railey's strained attempt to diminish the authority of *Smith*.  Moreover, the Eleventh Circuit (albeit in an unpublished decision) has characterized the above-quoted *Smith* language as a holding.  *See United States v. Beckett*, 369 F. App'x 52, 58 (11th Cir. 2010) (per curiam) (in rejecting a "sufficiency of the evidence" challenge to conviction under § 2251(a), stating: "We have **held** that the 'most natural reading of this provision is that jurisdiction extends to child pornography (1) produced with the intent that it

eventually travel in interstate commerce; (2) produced with materials that have traveled in interstate commerce; or (3) that has traveled in interstate commerce.' *United States v. Smith,* 459 F.3d 1276, 1289 (11th Cir. 2006). 'Only the first basis for jurisdiction requires any proof of mental state.' *Id.*" (emphasis added)).

Additionally, other Eleventh Circuit decisions have read § 2251(a)'s "interstate commerce" provision as offering three separate options for proving an interstate nexus. *See Grzybowicz*, 747 F.3d at 1306 (11th Cir. 2014) ("The interstate commerce element for [§ 2251(a)] is satisfied by proof that the child pornography was transmitted using a facility of interstate or foreign commerce, including by computer, **or was produced using materials that had been transported in interstate or foreign commerce**. *See* 18 U.S.C. § 2251(a) (prohibiting the production of child pornography so long as it is 'produced or transmitted using materials that have been mailed, shipped, or transported in ... interstate or foreign commerce by any means, including by computer,' or had 'actually been transported or transmitted using any means or facility of interstate or foreign commerce')." (emphasis added)); *United States v. Kapordelis*, 569 F.3d 1291, 1306 n.12 (11th Cir. 2009) ("[T]he behavior prohibited by § 2251(a) is punishable 'if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed,' 'if such visual depiction has actually been transported in interstate or foreign commerce or mailed,' or 'if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.' ");[17] *United*

---

[17] The undersigned disagrees with Railey's assessment that *Kapordelis* "supports our view"

*States v. Parton*, 749 F.3d 1329, 1329-30 (11th Cir.) ("18 U.S.C. § 2251(a) provides in relevant part: Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct ... shall be punished as provided under subsection (e), ... if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means...."), *cert. denied*, 135 S. Ct. 294 (2014); *United States v. Fee*, 425 F. App'x 847, 851 (11th Cir. 2011) (per curiam) (unpublished) ("To convict a defendant of sexual exploitation of a minor, the government must prove beyond a reasonable doubt that: (1) the defendant knowingly employed, used, persuaded, induced, enticed, or coerced a minor to engage in sexually explicit conduct; (2) the defendant did so for the purpose of producing a visual depiction of the conduct; and (3) the visual depiction was produced using materials that had traveled in interstate commerce." (citing 18 U.S.C. § 2251(a)).

Clearly, then, the "interstate commerce" provision of § 2251(b) consists of three independent clauses, each providing a separate basis for establishing the statute's "interstate commerce" element.[18] Thus, the interstate nexus requirement

---

(Doc. 232 at 13).

[18] The district court in *United States v. Cramer*, No. 1:CR-05-184, 2005 WL 3133775 (M.D. Pa. Nov. 23, 2005), rejected a defendant's similar grammatical gymnastics in interpreting § 2251(b):

> Defendant also argues that the Government has failed "to meet all of the jurisdictional requirements of 18 U.S.C. § 2251(b)." Defendant argues that a plain reading of § 2251(b) requires the Government to prove that Defendant either knew that the child pornography would be transported or actually had

may be satisfied, as here, by a showing that the illicit images were "produced with materials that have traveled in interstate commerce," without any proof of Railey's mental state or any proof that the images themselves were transported in interstate commerce. *See United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1271 (10th Cir. 2005) ("[I]n a 1998 amendment to the [Protection of Children Against Sexual Exploitation ]Act[ of 1977], a jurisdictional element was added to cover child pornography created 'using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means.' § 2251(a). This addition reflected Congress' concern 'about federal law enforcement's current inability to prosecute "a number of cases where the defendant produced the child pornography but did not intend to transport the images in interstate commerce." ' ' " (quoting *United States v. Morales-de Jesus*, 372 F.3d 6, 12 (1st Cir. 2004) (quoting

---

been transported in interstate or foreign commerce. Defendant argues that because Congress failed "to properly separate the clauses [of § 2251(b) ] into independent wholes" the entire clause is dependent, and Defendant "cannot be prosecuted unless he shipped the product or knew, or had reason to know, the product would be shipped in interstate commerce." However, Defendant's reading of § 2251(b) is strained and unsupported by law. The final three clauses of § 2251(b) specifying the jurisdictional criteria necessary to trigger punishment under subsection (e) are separated by "or", creating an inclusive disjunction. The Government need only prove one of the three listed elements to satisfy the jurisdictional requirement of § 2251(b). To find otherwise would require this Court to rewrite the statute and replace a disjunctive "or" with a conjunctive "and". Moreover, the Third Circuit has read the exact same language found in § 2251(a) as requiring proof of only one of the jurisdictional elements, not all three. [ *United States v. ]Rodia*, 194 F.3d [194 F.3d ]482[ (1999)]. Defendant admits, pursuant to the conditional plea agreement, that he knowing produced child pornography of a minor under his control using a camera that had traveled in interstate and foreign commerce. This admission satisfies all of the elements of § 2251(b). Consequently, Defendant's motion to dismiss the indictment for lack of jurisdiction must be denied.

2005 WL 3133775, at *3 (docket citations omitted).

H.R.Rep. No. 105–557, at 27 (1998), reprinted in 1998 U.S.C.C.A.N. 678, 695)));

*United States v. Galo*, 239 F.3d 572, 575 (3d Cir. 2001) ("[T]he requirement that at

least one of the materials used to produce the child pornography travel in interstate

commerce provides the jurisdictional hook" under § 2251(a)).

### 3.    Claim VI

In Claim VI, Railey argues, as an alternative to Claim V, that Dearman

should have objected to the only evidence the Government produced at trial to prove

the "interstate commerce" element of Counts 1 – 3 – specifically, "the testimony of

Eric Waldrep that the hard drive had stamped on it 'product of Thailand' and the

Kodak Easyshare camera had a label on it which said 'made in China[]' " (Doc. 220

at 23) – as both inadmissible hearsay and a violation of the Sixth Amendment right

to confrontation.[19] [20]   Both the hard drive and the camera were also introduced into

evidence at trial (as the Government's Exhibits 7 and 13, respectively).   (*See* Doc.

198 at 153; Doc. 199 at 55).

> Hearsay "is a statement, other than one made by the declarant while
> testifying at the trial or hearing, offered in evidence to prove the truth
> of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible
> unless the statement is not hearsay as provided by Rule 801(d), or falls
> into one of the hearsay exceptions enumerated in Rules 803, 804, and
> 807.

---

[19] "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with
the witnesses against him."   *United States v. Baker*, 432 F.3d 1189, 1204 n.6 (11th Cir.
2005) (quoting U.S. Const. amend. VI).

[20] Railey does not challenge his conviction under Count 4 in Claim VI, acknowledging that
"[a]s to count four the parties stipulated that the business owner of the store where the spy
pen video camera was purchased would testify that the device was purchased from a
company in Tennessee and then sold in Alabama."  (Doc. 220 at 23 n.8).

Moreover, if hearsay is "testimonial," that is, for example, "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Crawford v. Washington,* 541 U.S. 36, 52, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004) the Confrontation Clause prohibits its admission at trial unless (1) the declarant is unavailable, and (2) and the defendant has had a prior opportunity to cross-examine the declarant. *See id.* at 59, 68, 124 S. Ct. 1354. While the Supreme Court has not clarified which statements are in fact "testimonial" it has provided some guidance on the term's meaning. It defined "testimony" as "typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* at 51, 124 S. Ct. 1354 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). Thus, "formal statement[s] to government officers" are generally testimonial. *Crawford,* 541 U.S. at 51, 124 S. Ct. 1354. So is "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* Similarly, "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," fall within the "core class" of testimony. *Id.* at 51–52, 124 S. Ct. 1354.

"Statements taken by police officers in the course of interrogations" are *definitively* "testimonial." *Id.* at 52, 124 S. Ct. 1354. As the *Crawford* Court used the term "interrogation" in the "colloquial" and not "technical legal" sense, statements given in a formal interrogation setting at a police station and witness statements given to an investigating police officer are both considered "testimonial." *Id.* at 53 n.4, 124 S. Ct. 1354 (holding that post-*Miranda* statement "knowingly given in response to structured police questioning" was testimonial), at 58 n. 8, 124 S. Ct. 1354 (characterizing statement given by victim to an investigating police officer in *White v. Illinois,* 502 U.S. 346, 112 S. Ct. 736, 116 L.Ed.2d 848 (1992), as testimonial); *see also United States v. Arnold,* 410 F.3d 895, 903–04 (6th Cir. 2005) (holding that accuser's 911 call, initial statement to police upon their arrival at the crime scene, and statements made to police a short time later were testimonial).

Admission of non-testimonial hearsay against criminal defendants is not governed by *Crawford*, but still violates the Confrontation Clause

> unless the statement falls within a firmly rooted hearsay exception, or otherwise carries a particularized guarantee of trustworthiness. *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). A hearsay exception is firmly rooted if, "in light of longstanding judicial and legislative experience [the exception] rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." *Lilly v. Virginia,* 527 U.S. 116, 126, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999).

*United States v. Baker*, 432 F.3d 1189, 1203-04 (11th Cir. 2005).

Under *Strickland*, it is Railey's burden to demonstrate both that Dearman acted unreasonably in failing to lodge such an objection and that Railey was prejudiced by this failure – i.e. that is, he must show a reasonable probability that, but for Dearman's failure, the result of the proceeding would have been different. However, Railey has cited no authority, nor made any substantive argument, to demonstrate merit to his hearsay and Confrontation Clause claims, and the weight of authority indicates there was little chance of either being successful if raised at trial.

The Eleventh Circuit has rejected a defendant's argument, made for the first time on appeal, that a manufacturer's imprint on a handgun admitted into evidence was hearsay and thus could "not be relied upon to prove the fact the it traveled through interstate commerce[,]" holding "[i]t was not plain error to admit the firearm with the imprint on the handle. *See United States v. Thody*, 978 F.2d 625, 630–31 (10th Cir. 1992) (no plain error for hearsay argument raised first time on appeal by admitting a firearm with manufacturer's 'Made in Spain' inscription to prove gun's place of origin for purpose of demonstrating that weapon traveled in

interstate commerce[21]).”  *United States v. Clay*, 355 F.3d 1281, 1286-87 (11th Cir.

2004) (per curiam).[22] [23]

---

[21] A close reading of *Thody* suggests that its holding was meant to apply outside the context of “plain error” review as well.  *See Thody*, 978 F.2d at 630-31 (“Thody contends that the stamp ‘Made in Spain’ found on the butt of the gun is hearsay, and was thus inadmissible to prove the gun's place of origin… There was no [plain] error here. **Furthermore**, the manufacturer's imprint in the gun is not hearsay. It is technically not an assertion by a declarant as contemplated by the Rule.” (emphasis added)).

[22]     Railey suggests “the necessary implication[ in *Clay*] is that admission of the imprint was hearsay error[,]” reasoning that “a necessary predicate of plain error is that there first be error.”  (Doc. 232 at 23).   The undersigned disagrees.
     “The Supreme Court has established a three-step process for analyzing plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights.”  *United States v. King*, 73 F.3d 1564, 1572 (11th Cir. 1996) (citing *United States v. Olano*, 507 U.S. 725, 730-32 (1993)).   All three prongs of the “plain error” test must be satisfied, and a court need not determine whether an error actually occurred if any of the other prongs is not satisfied.  *See, e.g., id.* (“We need not discuss the entire plain error test because the second prong of the test-that the alleged error be plain-is not met…The government argues that even assuming that the district court's refusal to admit King's post-arrest statements was error, the error was not plain…We agree with the government that Rickard's failure throughout the trial to argue even indirectly the basis he now asserts for the statements' admission, despite repeated opportunities to do so, indicates that the error, if any, is not plain.”); *United States v. Swatzie*, 228 F.3d 1278, 1282 (11th Cir. 2000) (“We prefer in this case to take the Government's first recommended approach as to issues surrounding both the failure to submit the drug issues to the jury and the sufficiency of the indictment: we assume arguendo that there was error, and that it was plain… [H]oldings on these questions are not necessary to our affirmance of Swatzie's conviction and sentence; for the reasons we discuss below, Swatzie has not satisfied the other two parts of the plain-error test.”)
     *Clay* did not indicate under what “plain error” prong(s) the hearsay objection failed, simply stating that no “plain error” occurred.

[23]     In an unpublished decision, the Eleventh Circuit, without addressing whether the inscription constituted hearsay or violated the Confrontation Clause, held that, regardless of whether an agent’s testimony regarding the state where the gun at issue was manufactured was testimonial hearsay that the district court erred in admitting, because “the gun itself was in evidence and was stamped with the legend, ‘Made in U.S.A., Smith and Wesson, Springfield, Massachusetts[,]’ [o]ne could be ‘rationally able to conclude’ that it was manufactured outside Florida.”  *United States v. Williams*, 156 F. App'x 160, 161 (11th Cir. 2005) (per curiam) (quoting *Clay*, 355 F.3d at 1287).
     Recently, the First Circuit, like the district court it was reviewing, “accept[ed] for purposes of analysis [a defendant]’s claim that the inscription [on his thumb drive, ‘Made in China,’ ]was hearsay,” but nevertheless held that the district court did not plainly err in admitting the inscription under the “residual” hearsay exception in Federal Rule of

Those circuits that have addressed the issue outside of "plain error" analysis have held that manufacturer labels and inscriptions or testimony as to what they say does not constitute hearsay. *See United States v. Koch*, 625 F.3d 470, 480 (8th Cir. 2010) ("Nor did the court abuse its discretion in admitting testimony by agent Morris that Koch's computer and flash drive were each labeled as having been manufactured in China. While the better practice may be to prove the place of manufacture through a business record, we have previously rejected the claim that a manufacturer's inscription on a product is inadmissible hearsay. *See United States v. Bowling*, 32 F.3d 326, 328 (8th Cir. 1994) (manufacturer name on firearm admissible to prove interstate commerce element); *see also* Fed. R. Evid. 801(a)-(c), 901."); *United States v. Alvarez*, 972 F.2d 1000, 1004 (9th Cir. 1992) (per curiam) ("In *United States v. Snow,* 517 F.2d 441 (9th Cir. 1975), we held that a red tape imprinted with the defendant's name and affixed to a briefcase in which a gun was found was not hearsay, as the inscription did not constitute an assertion 'from which the truth of the matter asserted is desired to be inferred,' *id.* at 443 (quoting 1 Wigmore § 25 (3d ed. 1940)), but rather was a 'mechanical trace' and a type of circumstantial evidence not excludable under the hearsay rule. *Id.* at 443–44. For the same reason, we believe that a similar inscription on the firearm itself does not constitute hearsay. An inscription placed on a firearm by the manufacturer is

---

Evidence 807.  *United States v. Burdulis*, 753 F.3d 255, 262-64 (1st Cir.), *cert. denied*, 135 S. Ct. 467 (2014).  In assuming that the inscription was hearsay, however, the First Circuit noted that "[t]hree circuits have found that similar inscriptions are not statements falling within the hearsay rule." *Id.* at 263 n.8 (citing *United States v. Koch*, 625 F.3d 470, 480 (8th Cir. 2010); *Thody*, 978 F.2d at 630–31; *United States v. Alvarez*, 972 F.2d 1000, 1004 (9th Cir. 1992)).

similarly a mechanical trace and not a statement for purposes of Federal Rule of Evidence 801(c)… The district court did not abuse its discretion in admitting the firearm over Appellant's hearsay objection and in allowing the government to argue that the inscription on the gun indicated that it had been manufactured in Spain."), *overruled on other grounds*, *Kawashima v. Mukasey*, 530 F.3d 1111 (9th Cir. 2008).

Because Railey has failed to meet his burden to demonstrate that his hearsay objection was meritorious, he has also failed to demonstrate that his Confrontation Clause argument was meritorious. *See United States v. Jiminez*, 564 F.3d 1280, 1286 (11th Cir. 2009) ("There can be no doubt that the Confrontation clause prohibits only statements that constitute impermissible hearsay."); *United States v. Woods*, 684 F.3d 1045, 1063 n.20 (11th Cir. 2012) (per curiam) ("Because the admitted testimony was not hearsay, Woods's Confrontation Clause challenge also fails." (citing *Jiminez*, 564 F.3d at 1286)). Moreover, the Eighth Circuit has found no "plain error" under the Confrontation Clause in admitting an agent's testimony as to labels attached to hard drives indicating their origin. *See United States v. Huether*, 673 F.3d 789, 796 (8th Cir. 2012) ("According to Huether, Agents Erickson's and Helderop's testimony improperly allowed the government to prove the jurisdictional element of Counts One and Two—that the images were of individuals from outside North Dakota and transported to North Dakota via the internet, and that the hard drives and compact discs were manufactured outside North Dakota—by repeating conclusions of non-testifying persons… Agent Helderop testified that the labels affixed to the hard drives showed they were manufactured

outside the United States. He also testified to a conversation with personnel at Maxell, the CDs' distributor, in completing his analysis of the materials. But an examination of the labels alone showed the interstate transportation of the hard drives. Thus, this evidence undermines Huether's contention that Agent Helderop's testimony violated the Confrontation Clause." (citing *Koch*, 625 F.3d at 480)).

## C.   Ineffective Appellate Counsel  (Claim VII)

Count 5 of the Second Superseding Indictment charged an offense of "knowingly possess[ing]…material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce…" under 18 U.S.C. § 2252A(a)(5)(B).

At trial, Railey, through Dearman, moved for a judgment of acquittal after the Government rested its case in chief, raising several arguments.  In regard to the possession charge in Count 5, Dearman argued:

> [I]t is undisputed that the defendant, that all the photographs were found in the un-carved unallocated disk space[24]. As a result, it's impossible for him to possess it at any certain or any given time. As the expert, the government's own expert has testified, he could never pull those images up and look at them whenever he wanted to. He couldn't access them if he wanted to. The only way they could have been accessed was by actually going in with forensic software to pull them up. As a result it's impossible, as the indictment states, that he possessed child pornography on those dates. In regards to the possession.

---

[24] "Unallocated space is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle bin folder, that cannot be seen or accessed by the user without the use of forensic software. Such space is available to be written over to store new information. Even if retrieved, all that can be known about a file in unallocated space (in addition to its contents) is that it once existed on the computer's hard drive." *United States v. Pruitt*, 638 F.3d 763, 765 n.2 (11th Cir. 2011) (per curiam) (quoting *United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2011)).

(Doc. 204 at 40 [Trial Trans., p. 457])

In response to this argument, the Government stated:

As to the issue of possession, the fact that they were deleted and in unallocated space is of no moment. When he deleted them and reinstalled the operating system, both experts testified that the only user that they found in connection with any activity on that hard drive was the defendant. The operating system was reinstalled, we submit, to erase that data. But that doesn't mean he did not possess them when he took steps to remove them somebody was there in order to delete them.

(*Id.* at 41 [p. 458]).

Before the Court could rule on this motion, Dearman interjected:

May I proffer one thing, Judge. There is a 9th Circuit case that I didn't have time to dig through it. I thought you would excuse the jury. That the holding of it, very recent holding, that the images – that a person can't be held for possession of child pornography if there images are simply in unallocated disk space for the reasons I stated.

(*Id.* at 41-42 [pp. 458-59]).

The Court then stated: "Well, the facts are very specific in this case. And I think there is definitely circumstantial evidence that he possessed them. Whether or not he could access them doesn't mean he didn't possess them. I don't think there is any question that that was his computer. I deny your motion." (*Id.* at 42 [p. 459]).

After the close of evidence, Dearman renewed his motion for judgment of acquittal, stating:

I mentioned this yesterday, the name of the case that I was relating to was United States V Flyer, that's F L Y E R[25]. And that's when they directly -- the 9th Circuit directly attacks the 11th Circuit in regards to

---

[25] *United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011).

United States v Shiver[26], about defendant's exercise dominion and control over an image, it's to destroy a copy of the image located on his computer. In United States v Flyer, the Court ruled but deletion of an image alone doesn't support a conviction for knowing possession of child pornography on or about a certain date, within the meaning of Section 2252(a)4(b) [sic], no evidence indicated that on or about a certain date, in this case it was April 13th, 2004, Flyer could recover or view any of the charged images in unallocated space or he knew of its presence there. And they reversed his possession in connection with child pornography. It's not disputed in here on both of the government's witnesses, I asked them, could somebody pull up the picture and view the pictures whenever they wanted to and they both responded no, not without forensic software could they come up. And I said, well, if you use forensic software can you even be certain that the images would come up? And they said, no. You don't know it's been overwritten or what has happen. This case is exactly, in regards to the possession issue, exactly like United States v Flyer.

(Doc. 205 at 66-67 [Trial Trans., pp. 738-39]).

The Court responded: "I disagree. I think the facts support the inference that this defendant knew that those pornography images were there. That he intentionally deleted them by overwriting the operating system. And that on any date prior to the time that they were overwritten he certainly possessed them. And he knew they were there even after he deleted them. I deny your motion in that regard." (*Id.* at 67-68 [pp. 739-40]).

Railey now argues in Claim VII that his appellate counsel, Madden, was ineffective for failing to pursue on appeal his *Flyer*-based argument that a conviction for possession of child pornography cannot be sustained "when the only

---

[26] *United States v. Shiver*, 305 F. App'x 640, 643 (11th Cir. 2008) (per curiam) (unpublished). The Government's brief erroneously refers to *Shiver* as "binding precedent" in this Circuit (Doc. 227 at 32). *See* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."); *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

evidence to support the charge was the existence of child pornography in unallocated space."[27] (Doc. 220 at 24-25). Railey claims that he "wanted this issue argued on appeal" but that Madden "never consulted with [him] prior to filing his initial appeal brief as to which issues Railey wished presented in his appeal." (*Id.* at 25).

"An attorney is not required under the Constitution or the *Strickland* standards to raise every non-frivolous issue on appeal[.]" *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("Nothing in the Constitution or our interpretation of that document requires" an appellate attorney "to raise every 'colorable' claim suggested by a client.")), *cert. denied*, 135 S. Ct. 48 (2014), *reh'g denied*, 135 S. Ct. 743 (2014). "Appellate counsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.' " *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (superseded by statute on other grounds)).

Like Railey, the defendant in *Shiver*, in challenging his conviction under 18 U.S.C. § 2252A(a)(5)(B), contended on appeal "that the government's evidence was insufficient to support the jury's conclusion that he 'knowingly possessed' the images of child pornography on his computer." 305 F. App'x at 642. The Eleventh Circuit disagreed, finding "there was ample evidence that he knowingly possessed

---

[27] Railey states that *Flyer* was "cited with approval" in *Pruitt*, 638 F.3d 763 (11th Cir. 2011). (*See* Doc. 220 at 25). *Pruitt* cited *Flyer* only once, quoting in a footnote *Flyer*'s general explanation of the technical term "unallocated space." *See* n.24, *supra*. *Pruitt* did not cite *Flyer* in support of any substantive legal analysis.

the images on his computer." *Id.*[28]  This evidence included direct evidence, in the form of the defendant's admission to investigators that he had once possessed "a small amount" of child pornography but believed he had gotten rid of it, and substantial indirect evidence: "For example, during an interview with authorities, Shiver referred to himself as a 'pedophile.'  In addition, the government's computer expert testified that Internet searches conducted on Shiver's computer used words and terms that were likely to return pornographic images of children, and that many of the illicit images on Shiver's computer had been accessed on multiple occasions, thus belying Shiver's contention that a virus had placed the images on his computer without his knowledge. The government's expert also opined that, as a technological matter, the images on Shiver's computer could not plausibly be accounted for by pop-up windows." *Id.* at 643.

In pressing his claim, the defendant "insist[ed] that since all of the images had been deleted and stored in his computer's unallocated files, and since he lacked the 'forensic software' to access or retrieve the images from that location, he consequently lacked the ability to exercise dominion or control over the images." *Id.* The Eleventh Circuit rejected this argument, holding that, "even assuming that Shiver was in fact unable to retrieve the images from the unallocated files, he was

---

[28] The *Shiver* court, noting that "[i]n October 2008, Congress amended § 2252A(a)(5)(B) by inserting 'or knowingly accesses with intent to view,' after 'possesses[,]' " stated: "This amendment has essentially settled the question in this case of whether a defendant must exercise control or dominion over an image for purposes of § 2252A(a)(5)(B). Under the statute's present language, control appears unnecessary, so long as an individual knowingly accesses the illicit images." 305 F. App'x at 642 n.4 (alteration added).  Though Railey was subject to this new version of § 2252A(a)(5)(B), the Second Superseding Indictment did not charge "knowingly accesses with intent to view" in the alternative in Count V.

able to exercise control over the images by deleting them from his computer's cache." *Id.* (citing *United States v. Romm*, 455 F.3d 990, 1000-01 (9th Cir. 2006), as "observing that deleting images is a form of exercising control over them").

In *Flyer*, the defendant challenged his conviction for an offense under 18 U.S.C. § 2252(a)(4)(B) (2004), which "provides that any person who 'knowingly possesses ... with intent to view, 1 or more books, magazines, periodicals, films, videotapes, or other matter' containing visual depictions of a minor engaged in sexually explicit behavior shall be punished as provided in subsection (b)(2). 633 F.3d at 918.   Unlike the *Shiver* defendant, the defendant in *Flyer* added an additional element to his contention that the evidence was insufficient to establish that he "possessed" the files, arguing that the government had not shown possession "on or about April 13, 2004," the date charged in the indictment. *Id.* Specifically, because the images supporting this conviction were all located on a hard drive's "unallocated space," the defendant "argue[d] there was insufficient evidence to establish that he exercised dominion and control over the images recovered from the unallocated space on the hard drive[,]" and, "[a]lternatively,...that even if he could be said to have 'possessed' the images before their deletion, no evidence indicated that the possession occurred during the time period charged in the indictment." *Id.* at 918-19.

The Ninth Circuit, after analyzing its own precedent (including the *Romm* opinion cited in *Shiver*) and persuasive authority from another circuits, reversed the conviction, stating:

The government concedes that it presented no evidence that Flyer knew of the presence of the files on the unallocated space of his Gateway computer's hard drive. The government also concedes it presented no evidence that Flyer had the forensic software required to see or access the files. Unlike *Romm*, there is no evidence here that Flyer had accessed, enlarged, or manipulated any of the charged images, and he made no admission that he had viewed the charged images on or near the time alleged in the indictment.

The government counters that evidence demonstrating that the files had at some point been deleted, resulting in their placement in unallocated space, is sufficient to establish possession. In support, the government cites *United States v. Shiver,* 305 Fed. Appx. 640 (11th Cir. 2008) (unpublished), for the proposition that one method for a defendant to exercise dominion and control over an image is to destroy a copy of the image located on his computer. *See id.* at 643.[FN5]

> FN5 – As we recognized in *Romm*, "removal of files from the recycle bin generally requires manual steps to be taken by the user." 455 F.3d at 993 n.2.

But deletion of an image alone does not support a conviction for knowing possession of child pornography on or about a certain date within the meaning of § 2252(a)(4)(B) (2004). No evidence indicated that on or about April 13, 2004, Flyer could recover or view any of the charged images in unallocated space or that he even knew of their presence there. Accordingly, the district court committed plain error, and we reverse Flyer's conviction…

*Id.* at 919-20.  Clearly, then, the *Flyer* court did not reject *Shiver*'s proposition that deleting images from a computer is a manner of exercising dominion and control over them.  Rather, *Flyer* found the fact that an image was deleted, standing alone, was insufficient to show "possession" on a certain date, namely the date charged in an indictment.

Unlike in *Flyer*, substantial evidence was introduced at trial from which a reasonable jury could infer that Railey both knew of the presence of illicit images on his hard drive and that he exercised dominion and control over them "on or about

August 18, 2010," the date charged in Count 5.  The illicit images found in the hard drive's unallocated space included the above-mentioned "homemade" images depicting the exposed genitals of Railey's minor stepdaughter.  Government experts testified that the "homemade" images were taken with the family Kodak camera in May 2010 and that, based on distinctive scar and hair patterns, the adult man's hand depicted in those images belonged to Railey.  Both of Railey's stepdaughters also testified that Railey had sexually abused them on multiple occasions.  Railey's brother testified at trial that, while he was the one who purchased the laptop computer containing the hard drive, Railey was the only person who used it, and the Government's computer forensic expert testified that he found no evidence that anyone but Railey used to the laptop.  From this indirect evidence, a reasonable jury could infer that Railey produced these illicit "homemade" images with the camera and then transferred them to his laptop, thus "knowingly possessing" the images.  *Cf. United States v. Bobb*, 577 F.3d 1366, 1373 n.15 (11th Cir. 2009) (noting that "a person can 'possess' child pornography without taking 'receipt' of it…because a person can create the pornography himself").  Knowing that they were present on the laptop, Railey then exercised further dominion and control over the images on August 17, 2010, when he attempted to destroy or conceal them by re-installing the laptop's operating system, four days after his wife discovered Railey's pen camera and ordered him to leave the house.[29]

---

[29] "When the government charges that an offense occurred 'on or about' a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment.  Proof of a date reasonably near the specified date is sufficient."  *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989) (internal citation omitted).

Given that the significant evidence presented at Railey's trial suggesting "possession" "on or about" the date charged can be readily distinguished from the dearth of such evidence in *Flyer*, and given the high standard a defendant must meet to successfully appeal the denial of a motion for judgment of acquittal, *see* n.10, *supra*, a reasonable appellate attorney would have concluded that such an argument was unlikely to succeed. As such, Madden was not ineffective for failing to raise it on direct appeal. Moreover, even if Madden could be faulted for failing to pursue the argument on appeal, Railey has failed to show a reasonable probability that it would have succeeded and has thus failed to show prejudice. Accordingly, because Railey has failed to satisfy either *Strickland* prong in his lone claim against Madden, the undersigned **RECOMMENDS** that Claim VII be **DENIED** without an evidentiary hearing.

### D.    "Cumulative Prejudice"

As a last resort, Railey argues that "[i]f no one issue alone is sufficient to establish the required prejudice to vacate [his] conviction, then the cumulative effect of the above issues, or such of them as the Court accepts, is sufficient to establish that Railey has met his burden of establishing that the ineffective assistance of counsel prejudiced his defense…" (Doc. 220 at 25).

"The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim. However, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment

violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.' " *Forrest v. Florida Dep't of Corr.*, 342 F. App'x 560, 564-65 (11th Cir. 2009) (per curiam) (unpublished) (quoting *United States v. Cronic,* 466 U.S. 648, 659 n. 26 (1984)).   The Eleventh Circuit has also not addressed the issue, and the law of other circuits is mixed.   *See Ballard v. McNeil*, 785 F. Supp. 2d 1299, 1335-36 & n.21-22 (N.D. Fla. 2011) (collecting cases). However, the Eleventh Circuit has held that "[w]ithout harmful errors, there can be no cumulative effect compelling reversal."   *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984).   *See also United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.").

As discussed above, Railey has failed to show that either of his attorneys acted deficiently as to any of his claims of error.   However, even if the undersigned has rejected all claims solely on a failure to show prejudice under *Strickland*, the undersigned finds that any cumulative prejudice would be insufficient to warrant relief.   Assuming the various allegations of deficient performance in Claims I, II, and III are true, the record sufficiently demonstrates that these errors were not the but-for reason Railey chose to reject the plea agreement.   As for Claims IV – VII, none of these are relevant to whether Railey was given sufficient plea advice, and each of them comes down to counsel failing to raise an issue of law.   It is highly unlikely that any of the arguments in Claims IV – VII would have stood a better chance of success simply by counsel raising some or all of them at trial and on

appeal.   Accordingly, the undersigned **RECOMMENDS** that Railey's "cumulative prejudice" claim be **DENIED**.

### E.      Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned **RECOMMENDS** that a Certificate of Appealability be **DENIED** for Railey's § 2255 motion. 18 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may only issue where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2).

Where the district court "has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *See also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (citations omitted and punctuation modified)).).

"A prisoner seeking a COA must prove something more than the absence of

frivolity or the existence of mere good faith on his or her part." *Miller-El*, 537 U.S. at 338 (quotations omitted).   The undersigned finds that reasonable jurists could not debate whether any of Railey's ineffective assistance of counsel claims should be resolved in a different manner or that any of the issues presented is adequate to deserve encouragement to proceed further.   Accordingly, Railey is not entitled to a Certificate of Appealability on any of his claims.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   If there is an objection to this recommendation by the petitioner, he may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.   *See, e.g.*, *Brightwell v. Patterson*, No. CA 11-0165-WS-C, 2011 WL 1930676, at *6 (S.D. Ala. Apr. 11, 2011), *report & recommendation adopted*, 2011 WL 1930662 (S.D. Ala. May 19, 2011);[30] *Griffin v. DeRosa*, No. 3:10cv342/RV/MD, 2010 WL 3943702, at *4 (N.D. Fla. Sep. 20, 2010) (providing for same procedure), *report & recommendation adopted sub nom. Griffin v. Butterworth*, 2010 W: 3943699 (N.D. Oct. 5, 2010).

### F.   Appeal *In Forma Pauperis*

"An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."   28 U.S.C.A. § 1915(a)(3).   A district court's finding "that an appeal would not be in good faith because no certificate of

---

[30] It should be noted that in that proceeding, the Eleventh Circuit also denied the petitioner's motion for certificate of appealability on October 11, 2011.   (*See* Doc. 14 in CA-11-0165-WS-C.).

appealability had been issued . . . is not enough to explain why the appeal on the merits would not be in good faith, because the standard governing the issuance of a certificate of appealability is not the same as the standard for determining whether an appeal is in good faith. It is more demanding . . . [T]o determine that an appeal is in good faith, a court need only find that a reasonable person could suppose that the appeal has some merit." *Walker v. O'Brien*, 216 F.3d 626, 631-32 (7th Cir. 2000). *See also Weaver v. Patterson*, Civ. A. No. 11-00152-WS-N, 2012 WL 2568218, at *7 (S.D. Ala. June 19, 2012) (Nelson, M.J.), *report and recommendation adopted*, Civ. A. No. 11-00152-WS-N, 2012 WL 2568093 (S.D. Ala. July 3, 2012) (Steele, C.J.) ("An appeal may not be taken *in forma pauperis* if the trial court certifies in writing that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); *see* Fed. R. App. P. 24(a)(3)(A); *Lee v. Clinton*, 209 F.3d 1025, 1026 (7th Cir. 2000) (concluding that 'good faith' is 'an objective concept' and that 'not taken in good faith' is 'a synonym for frivolous'); *DeSantis v. United Techs, Corp.*, 15 F. Supp. 2d 1285, 1288–89 (M.D. Fla. 1998) (stating that good faith 'must be judged by an objective, not a subjective, standard' and that an appellant 'demonstrates good faith when he seeks appellate review of any issue that is not frivolous'). An appeal filed *in forma pauperis* is frivolous if 'it appears that the Plaintiff has little to no chance of success,' meaning that the 'factual allegations are clearly baseless or that the legal theories are indisputably meritless.' *Carroll v. Gross*, 984 F.2d 392, 393 (11th Cir. 1993)."). *But see, e.g., United States v. McCray*, No. 4:07CR20-RH, 2012 WL 1155471, at *2 (N.D. Fla. Apr. 5, 2012) ("Because the defendant has not obtained—and is not entitled

to—a certificate of appealability, any appeal by the defendant will not be taken in good faith.   I certify under Federal Rule of Appellate Procedure 24(a) that any appeal will not be taken in good faith and that the defendant is not otherwise entitled to proceed *in forma pauperis* on appeal.").

Considering the above-stated reasoning, the undersigned **RECOMMENDS** the Court certify that any appeal by Railey in this action would be without merit and therefore not taken in good faith and, accordingly, find that Railey is not entitled to appeal *in forma pauperis*.

## IV.   Conclusion

In accordance with the foregoing analysis, it is **RECOMMENDED** that Railey's § 2255 motion (Doc. 219) be **DENIED** and **DISMISSED with prejudice** and that Railey be found not entitled either to a Certificate of Appealability or to proceed *in forma pauperis* on appeal.

## V.   Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P 72(b).   The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the

district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.   In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this the 16th day of December 2015.

                         */s/ Katherine P. Nelson*
                         **KATHERINE P. NELSON**
                         **UNITED STATES MAGISTRATE JUDGE**